**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

GENERAL ELECTRIC CAPITAL
CORPORATION, a Delaware
Corporation,

        Plaintiff,

vs.

FPL SERVICE CORP.,

        Defendant.

No. C 13-59-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT**

---

**TABLE OF CONTENTS**

I.    **INTRODUCTION**................................................................. 2
    *A.    Factual Background* ................................................ 2
    *B.    Procedural Background* .......................................... 5

II.   **ANALYSIS** ........................................................................ 5
    *A.    Summary Judgment Standards*................................. 5
    *B.    Default*.................................................................. 7
    *C.    Disposition of Collateral*...................................... 12
        *1.    Is this a lease or a secured transaction?*............. 13
        *2.    Did GECC comply with Article 9 in disposing of the
            copiers?*..................................................... 16
            *a.    Did GECC dispose of the copiers in a
                commercially reasonable manner?* .......................... 17
            *b.    Did GECC give proper notice?* ............................... 20
    *D.    Damages*............................................................. 23

III.  **CONCLUSION** .............................................................. 23

In late October and early November of 2012, Hurricane Sandy devastated the East Coast, causing 186 deaths and billions of dollars in damage to the states,

businesses, and homes caught in its path.[1]  The defendant, FPL Services Corporation (FPL), was one of the businesses destroyed by the storm.  In particular, flood waters from Hurricane Sandy destroyed two of FPL's industrial copiers, which it leased from the plaintiff, General Electric Capital Corporation (GECC).  Because the copiers were destroyed, FPL stopped making lease payments to GECC.  GECC repossessed and resold the copiers, and now seeks damages, claiming that FPL breached the parties' lease contract.  FPL claims, among other things, that Hurricane Sandy excuses FPL from performing.

This case is now before me on GECC's motion for summary judgment (docket no. 9).  In its motion, GECC claims that FPL is liable under the parties' contract despite Hurricane Sandy, and requests $258,424.39, plus attorney's fees and costs.  For the reasons discussed below, GECC's motion is granted as to FPL's liability, but I will defer ruling on the issue of damages until after the parties submit additional evidence as discussed below.

## I.    INTRODUCTION

Because GECC moves for summary judgment, I recite the following facts in the light most favorable to FPL, the non-moving party.  *Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc.*, 382 F.3d 852, 855 (8th Cir. 2004).

### A.    Factual Background

This case is about the enforceability of a contract between GECC and FPL.  GECC is a Delaware corporation that does business in Iowa.  FPL is a New York direct-marketing corporation located near the southern shore of Long Island, in Oceanside, New York.  On June 14, 2011, GECC and FPL entered into a contract,

---

[1]    *Hurricane Sandy Fast Facts*, CNN (July 13, 2013, 2:37 PM), http://www.cnn.com/2013/07/13/world/americas/hurricane-sandy-fast-facts.

which is entitled "Lease Agreement."[2]  Under the contract, GECC agreed to provide FPL with two Ricoh Pro C901 copiers (the copiers), and related equipment.  In return, FPL agreed to make 60 rental payments of $6,229.30 to GECC.  For over a year, the parties performed under the contract without incident.  But, in late October of 2012, Hurricane Sandy struck Long Island, destroying nearly all of FPL's equipment, including the two copiers it leased from GECC.

After the hurricane, FPL stopped making its rental payments.  To this day, FPL has made only 19 of the 60 payments it agreed to make.  In addition to FPL's rental payments, the parties' contract describes FPL's options if the copiers were to be damaged:

> If any item of Equipment is . . . damaged, [FPL] will (and Rental Payments will continue to accrue without abatement until [FPL]), at [FPL's] option and cost, either (a) repair the item or replace the item with a comparable item reasonably acceptable to [GECC], or (b) pay [GECC] a sum equal to (1) all Rental Payments and other amounts then due and payable under the Lease, and (2) the present value of (i) all Rental Payments to become due during the remainder of the Lease term, and (ii) the Purchase Option amount set forth in this Lease, each discounted at . . . (y) the lease charge rate (as determined pursuant to Section 16) if this Lease provides for A dollar Purchase Option . . . [GECC] will then transfer to [FPL] all [of GECC's] rights, title, and interest in the Equipment "AS-IS, WHERE IS" WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER, Insurance proceeds will be applied toward repair or replacement of the Equipment or payment hereunder, as applicable.

---

[2] The parties dispute whether the contract is actually a lease, or is, instead, a secured transaction.  Thus, I will refer to the agreement generally as "the parties' contract."

(Docket no. 9-3, at 7).  Though the copiers were damaged after Hurricane Sandy, FPL never paid to replace or repair them, nor did it pay GECC a sum equal to its then-due rental payments plus the present value of its future rental payments.

In January of 2013, GECC repossessed one of the copiers from FPL.[3]  The repossession cost GECC $600.  On February 28, 2013, GECC sent FPL a "Notification of Disposition" letter, stating that "one or more events of default have occurred under the Loan Agreement," and that GECC intended to "sell the Collateral privately sometime after 10:00 am on March 11, 2013" (docket no. 9-3, at 10).  The letter defines the "Collateral" as "the equipment described on the attachment."  The attachment to the letter only describes one of the two copiers GECC leased to FPL.  FPL never responded to GECC's letter.

On May 6, 2013, GECC's law firm sent a letter to FPL demanding "immediate payment of the entire outstanding balance due on the Lease . . . together with interest and other charges" (docket no. 9-3, at 19).  On May 13, 2013, FPL's attorney wrote a reply letter to GECC's attorney disputing GECC's demand and stating that "[t]he other [copier] is still available should [GECC] wish to take it" (docket no. 14-2, at 10).  On June 5, 2013, GECC repossessed the second copier.  After repossessing the copiers, GECC resold them in June and July of 2013[4] with the help of Remarketing Solutions International, Inc. (Remarketing), a third-party remarketer that resells equipment like the copiers.

I will discuss additional facts as they become relevant to my analysis below.

---

[3] The parties do not provide any evidence of the exact date that GECC repossessed the first copier.  I presume it was in January of 2013 because the record contains an invoice for the cost of repossession dated 1/31/2013 (docket no. 14-2, at 16).

[4] Again, the parties do not provide the exact dates on which the copiers were resold.  I surmise that they were resold in June and July of 2013 based on two invoices in the record documenting the sales, which are dated 6/14/2013 and 7/11/2013 (docket no. 14-2, at 17-18).

## B.      Procedural Background

On June 6, 2013, GECC filed a Complaint in this court alleging that FPL breached its lease agreement with GECC (docket no. 1).  On July 8, 2013, FPL answered the Complaint, denying the substance of GECC's allegations and asserting a number of affirmative defenses (docket no. 5).  On September 30, 2013, GECC moved for summary judgment, claiming that there are no material factual disputes and that GECC is entitled to damages for FPL's breach of contract as a matter of law (docket no. 9).  On October 24, 2013, FPL resisted GECC's motion (docket no. 11), and on November 7, 2013, GECC filed a reply (docket no. 14).  I must now decide whether GECC is entitled to summary judgment, or whether this case should instead proceed to trial.

## II.      ANALYSIS

### A.      Summary Judgment Standards

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The Eighth Circuit Court of Appeals has explained:

> The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials

that set out "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548, *quoting* Fed. R. Civ. P. 56(e)(2). "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) quoting Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 557 U.S. at 586, *quoting Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc). Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g.*, *Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

The parties agree that I should apply Iowa law in resolving GECC's summary judgment motion. In fact, their contract contains a choice-of-law clause, which states that "this lease will be governed by the laws of the State of Iowa" (docket no. 9-3, at 20). Neither party contests this clause, and both parties cite to Iowa law in support of

their arguments. Thus, I will apply Iowa law in determining whether summary judgment is appropriate.

## B.    Default

GECC argues that FPL defaulted under the parties' contract by making only 19 of the 60 payments required under the contract. Accordingly, GECC claims that it is entitled to "$258,424.39, plus its attorneys' fees and costs," which represents GECC's calculation of damages under the contract (docket no. 14, at 5). FPL does not dispute that it stopped making payments to GECC after Hurricane Sandy struck. Instead, FPL argues that, because Hurricane Sandy could not have been anticipated, FPL is excused from performing under the contract.

FPL relies on two sections from the Restatement (Second) of Contracts to support its argument: section 261, which discusses supervening impracticability, and section 265, which discusses frustration of purpose. Iowa law recognizes both sections as defenses in breach-of-contract cases. *Mel Frank Tool & Supply, Inc. v. Di-Chem Co.*, 580 N.W.2d 802, 805-06 (Iowa 1998). The supervening-impracticability defense provides:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261. Similarly, the frustration-of-purpose defense provides:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining

> duties to render performance are discharged, unless the
> language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 265. Both defenses allow courts to discharge a party's contractual obligations as a matter of law. *Mel Frank Tool & Supply*, 580 N.W.2d at 806.

But, while both defenses involve a number of elements, one common element resolves FPL's argument. Sections 261 and 265 apply "*unless* the language [of the contract] or the circumstances indicate the contrary." Restatement (Second) of Contracts §§ 261, 265 (emphasis added). The last clause of both sections allows that "[a] party may, by appropriate language, agree to perform in spite of impracticability that would otherwise justify his non-performance" such that "[h]e can then be held liable for damages although he cannot perform." Restatement (Second) of Contracts § 261, cmt. *c*. Thus, the principles in sections 261 and 265

> yield[] to a contrary agreement by which a party may
> assume a greater as well as a lesser obligation. By such an
> agreement, for example, a party may undertake to achieve a
> result irrespective of supervening events that may render its
> achievement impossible, and if he does so his non-
> performance is a breach even if it is caused by such an
> event.

*Id*. cmt. *a*; Restatement (Second) of Contracts § 265, cmt. *b* ("The rule stated in [§ 265] is subject to limitations similar to those stated in § 261 . . . and it does not apply if the language or circumstances indicate the contrary.").

Here, the parties' contract contains express language obligating FPL to perform in spite of events that might otherwise justify FPL's non-performance. The contract provides:

- "[FPL's] payment obligations hereunder are absolute and unconditional and are not subject to cancellation, abatement, reduction, recoupment, defense or setoff for any reason whatsoever";

- "If any item of Equipment is lost, stolen or damaged . . . Rental Payments will continue to accrue without abatement"; and

- "[FPL is] responsible for loss and damage to the Equipment from *any cause whatsoever* on and after delivery thereof" (emphasis added).

(Docket no. 9-3, at 6-7). Thus, the contract explicitly assigns to FPL the risk of loss from "any cause whatsoever" and requires FPL to make monthly payments regardless of whether the copiers get damaged. Taken together, the provisions quoted above amount to a "hell-or-high-water" clause—"[a] clause in a personal-property lease requiring the lessee to continue to make full rent payments to the lessor even if the thing leased is unsuitable, defective, or destroyed." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 75 (Iowa 2011) (quoting Black's Law Dictionary 742 (8th ed. 2004)). As is discussed below, the parties dispute whether their contract constitutes a lease or a secured transaction. But, Iowa law enforces hell-or-high-water clauses regardless of whether they are found in a lease or a secured transaction.[5] *See id.* at 77

---

[5] I recognize that "[h]ell or high water provisions are common in the commercial leasing industry, and [that] they have been uniformly upheld by both state and federal courts, including the Iowa Supreme Court." *Greatamerica Leasing Corp. v. Davis-Lynch, Inc.*, No. 10-CV-13-LRR, 2011 WL 167248, at *3 (N.D. Iowa Jan. 19, 2011). But, if I were deciding the issue in the first instance, I would not enforce a hell-or-high-water clause against a party claiming an otherwise valid act-of-God defense, unless the parties specifically bargained for the hell-or-high-water clause. As a practical matter, hell-or-high-water clauses are rarely, if ever, specifically bargained for:

> In standard form contracts or leases, no real negotiation about the printed clauses takes place. One party simply presents the other with a standard form. The other party

("Courts have consistently enforced [hell-or-high-water] clauses in the financial leasing context."); *id.* at 78 ("[W]hen a secured transaction contains an express hell-or-high-water clause, courts must grant the provision full effect."). Because the parties' contract makes FPL's performance unconditional and assigns the risk of loss to FPL, FPL cannot rely on supervening impracticability or frustration of purpose to discharge its duty to perform.

---

> must either buy or lease the goods under the contract terms or forego the transaction. He probably cannot get better terms elsewhere, because all standard form contracts usually contain similar terms favoring the stronger party. Thus, no real negotiation or choice exists in these contract or lease situations.

Donald B. King, *Major Problems with Article 2a: Unfairness, "Cutting Off" Consumer Defenses, Unfiled Interests, and Uneven Adoption*, 43 Mercer L. Rev. 869, 870-71 (1992); *see also* Barry S. Marks & James M. Johnson, *Look Before You Lease: Pitfalls and Opportunities in Leasing Business Equipment*, Bus. L. Today, Dec. 1999, at 26, 28 ("Virtually all equipment leases contain a hell or high water clause stating that the lessee must make payments in all events, even if the equipment fails to function properly. The hell or high water clause is never negotiable."). Because hell-or-high-water clauses are both ubiquitous and non-negotiable, presumptively enforcing these clauses creates a default rule that a commercial lessee bears the risk of an act of God. I think the default rule should be the opposite: The party best able to bear the risk of an act of God should, by default, bear that risk. For commercial leases, the lessor—here GECC—is better able to bear the risk of an act of God because that risk is diluted by the sheer number of leases that commercial lessors typically hold. The risk of an act of God should only shift to the lessee—here FPL—if the parties specifically bargain to assign the risk to the lessee.

The rationale for presumptively enforcing hell-or-high-water clauses is "that these clauses are essential to the equipment leasing industry" and "[t]o deny their effect as a matter of law would seriously chill business in this industry . . . ." *In re O.P.M. Leasing Servs., Inc.*, 21 B.R. 993, 1007 (Bankr. S.D.N.Y. 1982). I am aware of no opinion citing empirical evidence supporting that rationale. If parties were required to specifically bargain for hell-or-high-water clauses, the commercial leasing industry would likely not collapse. Rather, the price of a lease would likely rise, unless the lessee agreed to bear the risk of an act of God.

Still, FPL argues that it could not have assumed the risk of loss because Hurricane Sandy was not reasonably foreseeable and, thus, FPL cannot be expected to have insured against it. FPL also argues that insuring the copiers against damage from "any cause whatsoever" is an impossible and illusory task. These arguments seem to conflate what are actually two separate obligations under the parties' contract: (1) FPL's obligation to pay GECC despite damage to the copiers, and (2) FPL's obligation to insure the copiers. As I noted above, the parties' contract obligated FPL to make payments to GECC regardless of damage to the copiers. The contract also requires FPL to "keep the Equipment insured against all risks of physical loss or damage for its full replacement value, naming [GECC] as loss payee" (docket no. 9-3, at 7).

Even assuming that FPL could not have anticipated the need to insure the copiers against flood damage, FPL's arguments are inapposite for two reasons. First, GECC does not appear to claim any damages based on FPL's failure to insure the copiers against flood damage. Rather, GECC calculates—and FPL contests—damages based on the formula in the "Loss or Damage" section of the parties' contract, which is unrelated to FPL's insurance obligation. *See* Part I.A (quoting the formula).

Second, FPL bases its argument on a misapplication of Restatement (Second) of Contracts § 261, comment *c*. To support its argument that it did not assume the risk of flood damage, FPL quotes the following:

> If the supervening event was not reasonably foreseeable when the contract was made, the party claiming discharge can hardly be expected to have provided against its occurrence. However, if it was reasonably foreseeable, or even foreseen, the opposite conclusion does not necessarily follow. Factors such as the practical difficulty of reaching agreement on the myriad of conceivable terms of a complex agreement may excuse a failure to deal with improbable contingencies.

Restatement (Second) of Contracts § 261, comment *c*. But, this commentary does not apply to the contract in this case. The part of the comment FPL cites discusses when a party may be excused for "a failure to deal with improbable contingencies." The contract at issue here does not fail to deal with improbable contingencies. To the contrary, it expressly deals with improbable contingencies by assigning the risk of those contingencies to FPL: "[FPL is] responsible for loss and damage to the Equipment from any cause whatsoever" (docket no. 9-3, at 7). Were the contract here silent on which party bears the risk of flood damage, the commentary FPL cites would be in play. But the contract is not silent and, thus, FPL is not excused from its obligation to perform.

Because the parties' contract contains enforceable hell-or-high-water provisions and assigns to FPL the risk of all loss or damage to the copiers, FPL cannot claim that it is excused from performance because of Hurricane Sandy. Thus, GECC's motion for summary judgment is granted on issue of liability. Liability, however, is only one of the contested issues before me. The parties alternatively contest whether GECC properly disposed of the repossessed copiers, and whether GECC is entitled to damages in the amount it claims. I will address these issues below.

## C.    *Disposition of Collateral*

FPL alternatively argues that there is a genuine issue of material fact as to how GECC disposed of the two copiers after repossessing them. Specifically, FPL argues (1) that the parties' contract is a secured transaction governed by Article 9 of Iowa's Uniform Commercial Code (UCC), and (2) that, under Article 9, GECC failed to show that it properly disposed of the repossessed copiers. GECC argues that the parties' contract is an Article 13 lease, not an Article 9 secured transaction, and, thus, GECC need not comply with Article 9's disposition requirements. But, even if Article 9 applies, GECC argues that FPL waived its rights under Article 9, and that, in any

event, GECC complied with Article 9's requirements. I will address these arguments in turn.

### 1. Is this a lease or a secured transaction?

GECC's obligations to FPL in disposing of the two copiers depend, in large part, on whether the parties' contract is a lease or a secured transaction. If it is a lease, Article 13 of Iowa's UCC applies; if it is a secured transaction, Article 9 applies. FPL argues that Article 9 applies and that GECC failed to comply with it when it resold the copiers. In particular, FPL suggests that GECC cannot show that it resold the copiers in a commercially reasonable manner, and that GECC did not properly notify FPL of the resale, as is required under Article 9. *See* Iowa Code § 554.9610(2) (requiring a commercially reasonable disposition); *id.* § 554.9611 (requiring notice of disposition). GECC argues that the parties' contract is a lease and, thus, GECC need not comply with these Article 9 requirements, which only apply to secured transactions. *Id.* § 554.9109 (providing that Article 9 applies to secured transactions); *id.* § 554.13103 (providing that a lease cannot be a secured transaction).

GECC relies on language in the parties' contract describing the agreement as a lease. The contract reads: "This lease constitutes a 'finance lease' as defined in Article 2A of the Uniform Commercial Code" (docket no. 9-3, at 6). Article 2A of the UCC is found at Article 13 of Iowa's UCC. Based on this clause, GECC argues that FPL voluntarily agreed that its contract with GECC was a lease, and that FPL cannot now claim that Article 9 applies.

Whether a contract constitutes a lease or a security agreement, however, does not depend on whether the parties call it a "lease" or a "security agreement." Rather, the nature of a contract depends "objectively on the economic reality of the transaction." *Wolfe*, 795 N.W.2d at 76. More specifically,

> [w]hether an agreement creates a security interest depends
> not on whether the parties intend that the law *characterize*
> the transaction as a security interest but rather on whether
> the transaction falls within the definition of "security
> interest" in Section 1-201. Thus, an agreement that the
> parties characterize as a "lease" of goods may be a "security
> agreement," notwithstanding the parties' stated intention that
> the law treat the transaction as a lease and not as a secured
> transaction.

Iowa Code § 554.9102, cmt. 3(b). Parties may, however, agree to treat a general lease as a more specific "finance lease." *See id.* § 554.13103, cmt. (g) ("If a transaction does not qualify as a finance lease, the parties may achieve the same result by agreement . . . ."); *but see id.* ("For a transaction to qualify as a finance lease it must first qualify as a lease."). Parties may not agree to treat a secured transaction as a lease. *See Wolfe*, 795 N.W.2d at 76 ("[W]hile Lake MacBride and Frontier could have agreed to treat a lease as a finance lease, they could not agree to treat a sale with a security interest as a lease.").

"[T]o determine whether the lease agreement is properly considered a finance lease or a secured transaction, we must first consider whether the agreement retained or created a security interest." *Id.* at 74 (citing *C & J Vantage Leasing Co. v. Outlook Farm Golf Club, LLC*, 784 N.W.2d 753, 757 (Iowa 2010)). "If so, the agreement cannot qualify as a lease or a finance lease because an agreement retaining or creating a security interest is specifically excluded from the definition of a lease." *Id.* (citing Iowa Code § 554.13103(1)(j)). Iowa Code § 554.1203 governs whether a contract in the form of a lease actually creates a lease or a security interest. It provides:

> A transaction in the form of a lease creates a security
> interest if the consideration that the lessee is to pay the
> lessor for the right to possession and use of the goods is an
> obligation for the term of the lease and is not subject to
> termination by the lessee, and:

a. the original term of the lease is equal to or greater than the remaining economic life of the goods;

b. the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

c. the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or

d. the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

Iowa Code § 554.1203(2). By its text, § 554.1203(2) creates a two-part, bright-line test. Under the test, the contract in this case creates a security interest, not a lease, "if it: (1) prohibits [FPL] from terminating the obligation to pay [GECC] for the right to possess and use the [copiers], and (2) meets one of the four independent criteria listed in [§ 554.1203(2)(a)-(d)]." *Wolfe*, 795 N.W.2d at 74 (citations omitted).

The contract at issue here satisfies § 554.1203(2)'s two-part test. First, it prohibits FPL from terminating its obligation to pay GECC for the copiers when it states that "[FPL's] payment obligations hereunder are absolute and unconditional and are not subject to cancellation, abatement, reduction, recoupment, defense or setoff for any reason whatsoever" (docket no. 9-3, at 6). Second, it meets one of the four independent criteria—namely, subpart (d)—because it gives FPL the option to own the copiers for nominal consideration—$1.00—if it complies with the agreement. Specifically, the first page of the contract provides an "End of Lease Purchase Option" of "$1.00 Purchase Out" (docket no. 9-3, at 5). Later, the contract states that, "[i]f this lease provides for a Dollar Purchase Option and [FPL is] not in default, [GECC]

will release any security interest we have in the Equipment at the end of the Lease Term" and that, "[u]pon payment of the applicable amount, [GECC] will transfer the Equipment to [FPL] 'as is, where is' . . ." (docket no. 9-3, at 7). Because the contract here satisfies § 554.1203(2), it constitutes a secured transaction, rather than a lease, regardless of the language used in the contract.

Moreover, after GECC repossessed the copiers, it sent FPL a "Notification of Disposition of Collateral" letter, which makes clear that the parties' contract was a secured transaction (docket no. 9-3, at 10-11). The letter describes the parties' agreement using mostly secured-transaction terms. For instance, GECC describes itself as the "Secured Party" and FPL as the "Debtor." GECC notes that it has a "security interest" in "collateral" equipment—*i.e.*, the copiers. And, while the parties' contract is titled "Lease Agreement," GECC's notification letter calls it a "Loan and Security Agreement." These descriptions bolster what the application of § 554.1203(2) confirms—that the parties' contract created a security interest in favor of GECC.

Because the parties' contract is a secured transaction, Article 9 applies. Thus, I will address below whether GECC complied with Article 9's requirements for disposing of the repossessed copiers.

## 2. Did GECC comply with Article 9 in disposing of the copiers?

FPL argues that there is a genuine factual dispute as to whether GECC complied with Article 9's requirement that GECC sell the repossessed copiers in a commercially reasonable manner. FPL also notes that GECC only gave FPL explicit notice that it was reselling one of the repossessed copiers. Although FPL makes no argument based on this fact, it too bears on whether GECC complied with Article 9. GECC claims that, under the parties' contract, FPL waived GECC's obligation to resell the collateral or notify FPL of any resale. GECC quotes a number of contract clauses, the most relevant of which states that "[GECC] may, but will have no obligation to, sell or

otherwise dispose of the [copiers], with or without notice to [FPL], at a public or private sale, and without any duty to account to [FPL] with respect to such action or inaction or for any proceeds with respect thereto" (docket no. 9-3, at 7). Alternatively, GECC argues that it resold the copiers in a commercially reasonable manner.

GECC's argument that FPL waived its Article 9 rights is unavailing. A debtor cannot waive the UCC's requirement that secured parties dispose of repossessed collateral in a commercially reasonable manner. *See* Iowa Code § 554.9602(7) (noting that a debtor cannot waive its rights under Iowa Code § 554.9610(2)); *id.* § 554.9610(2) (requiring that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable"). Also, "[a] debtor . . . may waive the right to notification of disposition of collateral under section 554.9611 only by an agreement to that effect entered into and authenticated after default." *Id.* § 554.9624(1). The record contains no evidence of such a post-default agreement. Thus, FPL could not have waived its rights to a commercially reasonable copier resale, or to notice of that resale.

The questions remain whether there is a material factual dispute regarding the reasonableness of GECC's resale and whether GECC properly notified FPL of the resale. I will address these questions in turn.

> **a.      Did GECC dispose of the copiers in a commercially reasonable manner?**

Iowa Code § 554.9610(2) provides:

> Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

The UCC provides examples of commercially reasonable dispositions. For instance, "[a] disposition of collateral is made in a commercially reasonable manner if the disposition is made . . . in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." *Id.* § 554.9627(2)(c). "The burden of proving commercial reasonableness [is] on . . . the secured party." *John Deere Leasing Co. v. Fraker*, 395 N.W.2d 885, 888 (Iowa 1986); *see also* Iowa Code § 554.9626(1)(b) ("[I]f the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part.").

FPL argues that "GECC has not provided any facts to show it disposed of the collateral in a commercially reasonable manner" (docket no. 11, at 5). In fact, GECC has offered evidence that it disposed of both copiers in a commercially reasonable manner. GECC offers an affidavit of Rick Tyler (Tyler), the bookkeeper in charge of maintaining GECC's records regarding its contract with FPL, who states that GECC resold both repossessed copiers through Remarketing, a third-party remarketer that "GECC customarily and regularly engages" to remarket inventory, such as the two copiers (docket no. 14-2, at 5). According to Tyler, Remarketing

> emailed approximately 2500 potential buyers identified as those that customarily purchase this type of equipment. Two bids were made for the First Copier and Remarketing accepted the highest bid ($2200). Remarketing then contacted the same buyer to see if it was interested in purchasing the Second Copier for $2200. That offer was accepted and Remarketing charged GECC a $946.00 commission for the sale of both copiers.

(Docket no. 14-2, at 5-6). GECC also produced two invoices from Remarketing, which show that it resold both copiers for $2,200 (docket no. 14-2, at 17-18). Taken at face value, a reasonable fact finder could rely on this evidence to conclude that GECC

resold the copiers "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." Iowa Code § 554.9627(2)(c).

I cannot rely on Tyler's statements, however, because most of them are not *admissible* evidence, at least in their current form. At the summary judgment stage, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). As it stands, Tyler's affidavit does not state how he has personal knowledge of the way in which Remarketing resold the copiers. I am left to wonder: How does he know who Remarketing e-mailed? How does he know who bid on the copiers? How does he know that Remarketing contacted the first copier's buyer about buying the second copier? These questions are central to whether GECC resold the copiers in a commercially reasonable manner. But, without knowing the basis for Tyler's personal knowledge, I can only conclude that his assertions are inadmissible hearsay. Because I cannot rely on inadmissible evidence in granting summary judgment, I must conclude that GECC has failed to meet its burden to show that it resold the copiers in a commercially reasonable manner.

I note, however, that if GECC had offered admissible evidence supporting Tyler's affidavit, I would likely conclude that GECC's sale of the copiers was commercially reasonable as a matter of law. "The commercial reasonableness of a sale of collateral is ordinarily a question of fact." *Fraker*, 395 N.W.2d at 887. Yet, in this case, FPL does not dispute the substance of GECC's claims. FPL offers no evidence that GECC *failed* to resell the copiers in a commercially reasonable manner; FPL only that argues that GECC has no evidence that the resale was commercially reasonable. Thus, had GECC produced admissible evidence of commercial reasonableness, that

evidence would be undisputed on this record and summary judgment would be appropriate.

But, because GECC offers no admissible evidence that it resold the copiers in a commercially reasonable manner, I cannot grant summary judgment in favor of GECC on the issue of damages. This is because the amount of damages GECC is entitled to will depend on whether it resold the copiers in a commercially reasonable manner. *See* Iowa Code § 554.9626(1)(c) (limiting damages in cases where collateral disposition is not commercially reasonable). Still, with a little more evidence, it may be possible to resolve GECC's damages on summary judgment. Rule 56(e)(1) provides that, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . give an opportunity to properly support or address the fact." Thus, I will allow both parties 30 days from the date of this order to present additional declarations or other admissible evidence solely on the question of whether GECC resold the copiers in a commercially reasonable manner. Any additional submissions must be made in 10 pages or less.

### b.  Did GECC give proper notice?

In addition to its arguments about whether GECC resold the copiers in a commercially reasonable manner, FPL notes that GECC never gave FPL notice that it planned to resell the second copier. Although FPL makes no argument based on this observation, I will address it because it bears on whether GECC complied with Article 9's requirements.

Under Article 9, GECC, the secured party, was required to send FPL, the debtor, "a reasonable authenticated notification of disposition" before GECC disposed of the copiers. *See* Iowa Code § 554.9611(2)-(3). Here, GECC sent FPL a disposition notification on February 28, 2013, stating, among other things, that GECC "intends to sell the Collateral privately sometime after 10:00 am on March 11, 2013" (docket no.

9-3, at 16). This notification was timely because GECC sent it "after default and ten days or more before the earliest time of disposition set forth in the notification . . . ." Iowa Code § 554.9612(2). It also provided sufficient information for a private sale notification, as outlined in Iowa Code § 554.9613(5).

But, as FPL notes, GECC's notification only listed one of the two copiers that GECC ended up reselling. The record contains no evidence that GECC ever notified FPL that it planned to resell the second repossessed copier. In fact, GECC does not claim to have notified FPL of the second sale. Rather, GECC argues that "FPL waived its rights to receive notice when [FPL] requested GECC pick up the second copier" (docket no. 14, at 4). As I noted above, however, FPL could only have waived its right to notification under Article 9 by signing a post-default waiver, which it did not do. Iowa Code § 554.9624(1). Thus, the record contains evidence that GECC failed to comply with Article 9's notice requirements.

Like the issue of whether GECC's disposition was commercially reasonable, GECC's failure to properly notify FPL about reselling the second copier may affect the damages GECC can collect. "[I]f the secured party's compliance [with Article 9's disposition rules] is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part." *Id.* § 554.9626(1)(b). If the secured party fails to meet its burden,

> the liability of a debtor . . . for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of:
>
> > (1) the proceeds of the collection, enforcement, disposition, or acceptance; or
> >
> > (2) the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this

> part relating to collection, enforcement, disposition, or acceptance.

*Id*. § 554.9626(1)(c).   Iowa Code § 554.9626(1)(d) provides that "the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney's fees unless the secured party proves that the amount is less than that sum."

Thus, Iowa law applies a "rebuttable presumption rule for transactions other than consumer transactions." *Id*. § 554.9626, cmt. 3.   Under the rebuttable presumption rule,

> [u]nless the secured party proves that compliance with the relevant provisions would have yielded a smaller amount, . . . the amount that a complying collection, enforcement, or disposition would have yielded is deemed to be equal to the amount of the secured obligation, together with expenses and attorney's fees. Thus, the secured party may not recover any deficiency unless it meets this burden.

*Id*.   Here, GECC has failed to meet its burden to prove that it complied with Article 9's notice requirements.   The rebuttable presumption rule, then, sets GECC's deficiency damages to zero, unless GECC can prove that it would have received $2,200 for the second copier even if it had properly notified FPL.   GECC's evidence that the second copier was sold to the same buyer and for the same price as the first copier, though FPL only received notice about the first, suggests that GECC would have received $2,200 if it had given FPL notice of the second sale.   FPL offers no evidence to the contrary.   But, again, GECC's evidence describing the second copier's sale is not admissible on the current record, and, thus, cannot support GECC's motion for summary judgment.

Whether GECC's deficient notice affects its damages will depend on whether GECC can prove, with admissible evidence, that it resold the copiers in a commercially

reasonable manner. I will therefore wait until after the parties submit additional evidence on whether GECC resold the copiers in a commercially reasonable manner. If GECC offers admissible evidence that it resold the copiers in a commercially reasonable manner, and FPL offers no evidence to the contrary, then GECC may be entitled to summary judgment on the issue of damages. If FPL offers evidence refuting the claim that GECC resold the copiers in a commercially reasonable manner, then the issue of damages will proceed to trial.

### D.  *Damages*

Finally, FPL raises a number of issues related to GECC's damages calculations. FPL argues (1) that GECC did not apply the proceeds from reselling the copiers to FPL's deficiency balance, and (2) that GECC incorrectly calculated its damages under the parties' contract. Ordinarily, calculating damages based on a contractual formula is a question of law. *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 179 (Iowa 2010) ("If the court finds that no ambiguity exists, contract interpretation and its legal effect are questions of law for the court." (quoting *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 439 (Iowa 2008))). But, in this case, there is a prior fact question that may render FPL's remaining arguments on damages moot. Specifically, if GECC cannot prove, as a matter of law, that it resold the copiers in a commercially reasonable manner, then it is not entitled to summary judgment on the question of damages. If GECC cannot prove that same fact at trial, then GECC's damages are zero and I will not need to address FPL's damages arguments. Thus, I will wait to address FPL's damages arguments until after the parties present additional evidence about whether GECC resold the copiers in a commercially reasonable manner.

### III.  CONCLUSION

GECC's motion for summary judgment is granted as to FPL's liability for defaulting under the parties' contract. I will defer ruling on whether GECC is entitled

to summary judgment as to its damages until after the parties have the opportunity to present additional evidence regarding whether GECC resold the copiers in a commercially reasonable manner. Both parties have 30 days from the date of this order to submit no more than 10 pages of additional evidence establishing, or refuting, that GECC resold the copiers in a commercially reasonable manner. I will rule on whether GECC is entitled to summary judgment on the issue of damages after reviewing the parties' submissions.

        **IT IS SO ORDERED**.

        **DATED** this 3rd day of December, 2013.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA