**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware Corporation,,<br><br>Plaintiff,<br>vs.<br>FPL SERVICE CORP.,<br><br>Defendant. | No. C 13-59-MWB<br><br>**SUPPLEMENTAL MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

_____

**TABLE OF CONTENTS**

*I.   INTRODUCTION ............................................................................. 1*

*II.  ANALYSIS ....................................................................................... 2*
    *A.   **Can GECC recover deficiency damages in this case?** ..................... 3*
    *B.   **Did GECC correctly calculate its deficiency damages?** .................. 9*

*III. CONCLUSION ............................................................................... 13*

### I.   INTRODUCTION

This case is again before me on plaintiff General Electric Capital Corporation's (GECC's) motion for summary judgment (docket no. 9). This is the second part of a two-part opinion. On December 3, 2013, I issued the first part of my opinion (docket no. 15). *See Gen. Elec. Capital Corp. v. FPL Serv. Corp.*, No. C 13-59-MWB, 2013 WL 6238484 (N.D. Iowa Dec. 3, 2013). There, I introduced the facts of this case and the legal issues involved, which I will not repeat in detail here. In short, I held that defendant FPL Service Corporation (FPL) is liable for defaulting on its contract with

GECC, by which FPL leased two industrial copiers from GECC. I also held that the contract between GECC and FPL was a secured transaction and, thus, GECC had to comply with Article 9 of Iowa's Uniform Commercial Code (UCC) when it repossessed and resold the two copiers upon FPL's default.

The amount of damages is the only remaining issue. GECC seeks $258,424.39, plus attorneys' fees and costs, as deficiency damages for FPL's default. FPL claims that the issue of damages should proceed to trial or, alternatively, that GECC incorrectly calculated its damages under the parties' contract. I deferred ruling on the issue of damages in my first summary judgment ruling to give the parties additional time to submit evidence relating to damages. Only GECC submitted additional evidence. After reviewing GECC's recent submission, I conclude that there is no genuine dispute on the issue of damages. Thus, for the reasons discussed below, GECC's motion for summary judgment is granted in full.

## II.   ANALYSIS

FPL raises a number of arguments that affect if, and how much, GECC can recover in deficiency damages under the parties' contract. First, FPL suggests that GECC cannot prove that it resold the two copiers in a commercially reasonable manner. FPL also notes that GECC failed to give FPL notice that it planned to resell the second copier. These issues affect whether GECC can recover *any* deficiency damages against FPL. Alternatively, FPL argues that GECC erred in calculating the amount of damages owed under the parties' contract. I will address these issues in turn.

### A. Can GECC recover deficiency damages in this case?

"[I]f [a] secured party's compliance [with Article 9] is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part." Iowa Code § 554.9626(1)(b). Here, FPL has placed GECC's compliance with Article 9 at issue in two ways. First, FPL argues that "GECC has not provided any facts to show that it disposed of the collateral in a commercially reasonable manner" (docket no. 11, at 5), as required by Iowa Code § 554.9610(2). Second, FPL notes that GECC never gave FPL notice that it planned to resell the second copier, as required by Iowa Code § 554.9611. Thus, under Iowa Code § 554.9626(1)(b), GECC bears the burden of proving that it complied with Article 9 in repossessing and reselling the two copiers.

If GECC fails to meet its burden, then it can only recover deficiency damages allowed under the "rebuttable presumption rule." The rebuttable presumption rule provides:

> [E]xcept as otherwise provided in section 554.9628, if a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance, the liability of a debtor . . . for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of:
>
> (1) the proceeds of the collection, enforcement, disposition, or acceptance; or
>
> (2) the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance.

> [F]or purposes of . . . subparagraph (2), the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney's fees unless the secured party proves that the amount is less than that sum.

*Id.* § 554.9626(1)(c)-(d). Stated differently, once the rebuttable presumption rule applies,

> [u]nless the secured party proves that compliance with the relevant provisions would have yielded a smaller amount . . . the amount that a complying collection, enforcement, or disposition would have yielded is deemed to be equal to the amount of the secured obligation, together with expenses and attorney's fees. Thus, the secured party may not recover any deficiency unless it meets this burden.

*Id.* § 554.9626, cmt. 3. In short, if GECC cannot prove that it complied with Article 9 in disposing of the two copiers, then its deficiency damages are presumptively zero, unless GECC proves that, had it complied with Article 9, its proceeds from reselling the two copiers would have been less than the sum of FPL's outstanding obligation, GECC's expenses, and GECC's attorneys' fees.

After reviewing the updated record, I conclude that GECC has presented undisputed evidence that it disposed of the copiers in a commercially reasonable manner. A secured party can prove that "[a] disposition of collateral [was] made in a commercially reasonable manner" by showing that "the disposition [was] made . . . in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." *Id.* § 554.9627(2)(c). Here, GECC disposed of both copiers through a third-party remarketing business, Remarketing Solutions International, LLC (Remarketing), which finds buyers for repossessed equipment like the copiers. Originally, GECC attempted to prove that Remarketing disposed of the copiers in a commercially reasonable manner by submitting the affidavit of Rick Tyler

(Tyler), GECC's bookkeeper in charge of its records involving FPL. But, because Tyler's affidavit did not establish his personal knowledge of how Remarketing resold the copiers, I held that I could not rely on it in granting summary judgment. *Gen. Elec. Capital Corp.*, 2013 WL 6238484, at *10.

GECC has since provided additional evidence establishing that Remarketing resold the copiers in a commercially reasonable manner. On January 2, 2014, GECC submitted the declaration of John O'Connor (O'Connor), the President of Remarketing, who was responsible for creating and maintaining the records related to reselling the copiers (docket no. 16). O'Connor's declaration establishes the following:

- In reselling repossessed copiers for GECC and similar clients, Remarketing "contact[s] [its] potential buyers that [it] [has] cultivated through years of previous transactions and marketing by emailing a listing of the particular copier along with other re-sell inventory[,] . . . obtain[s] bids from the buyers for a period of 30 days[,] . . . [and] accept[s] the highest bid" (docket no. 16, ¶ 3).

- In reselling the copiers, "[Remarketing] emailed approximately 2500 potential buyers which [Remarketing] identified from past transactions and marketing efforts as those that customarily purchase this type of equipment for parts. [Remarketing] identified potential buyers for the copiers by past purchases and confidential and proprietary data fields in [Remarketing's] confidential and proprietary database regarding customers for used equipment." (Docket no. 16, ¶ 6).

- Remarketing sold the first copier to the highest bidder—a buyer named "Viet"— for $2,200 (docket no. 16, ¶ 7). O'Connor attached e-mail records of the correspondence between Remarketing and Viet leading up to, and including, the final sale price (docket no. 16, at 8-9). After repossessing the second copier, Remarketing contacted Viet, who purchased the second copier for $2,200

5

(docket no. 16, ¶ 8). O'Connor provided no documentation regarding the sale of the second copier.

- "Among dealers of used copiers, emailing potential buyers to bid on the copiers is in conformity with the copier re-sale industry as [Remarketing] wants to obtain the highest price available for the copier in order to maximize its commission and profit" (docket no. 16, ¶ 9). "Likewise, contacting Viet to see if he was interested in purchasing the Second Copier for the same price is in conformity with the copier re-sale industry as [Remarketing] seeks to maximize its profits from the resale of the Second Copier" (docket no. 16, ¶ 10).

O'Connor also referenced two invoices that GECC produced earlier, showing that Remarketing sold both copiers for $2,200 (docket no. 14-2, at 17-18). Finally, GECC attached to O'Connor's declaration a portion of GECC's contract with Remarketing, showing that Remarketing was entitled to a percentage of the copiers' resale price, thus incentivizing Remarketing to resell the copiers for the highest possible price.

O'Connor's declaration provides evidence, from a source with personal knowledge, that the manner in which Remarketing resold the two copiers "conform[ed] with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." Iowa Code § 554.9627(2)(c). GECC has, therefore, produced evidence that it disposed of the copiers in a commercially reasonable manner. FPL offers no evidence to the contrary. Thus, GECC's evidence that it resold the copiers in a commercially reasonable manner is undisputed on this record. Because there is no genuine dispute over the *manner* in which GECC disposed of the two copiers, I find that GECC resold the copiers in a commercially reasonable manner. *See AKA Mgmt., Inc. v. Branch Banking & Trust Co.*, 621 S.E.2d 576, 580 (Ga. Ct. App. 2005) ("[W]hether a sale was commercially reasonable . . . may be determined as a matter of law where the creditor offers prima facie, uncontradicted evidence that the

sale was reasonable." (citation omitted)); *U.S. Bancorp Equip. Fin., Inc. v. DCC II Aircraft Corp., Inc.*, No. CIV A 04-CV-4586, 2006 WL 4381496, at *5 (E.D. Pa. Feb. 1, 2006) (granting summary judgment in favor of plaintiff secured party where "there [was] simply no evidence that plaintiff's sale of the [collateral] was not commercially reasonable").

O'Connor's declaration, however, does not directly resolve FPL's second argument—that GECC failed to give FPL notice of the second copier's disposition. GECC offers no evidence that it notified FPL of its plans to resell the second copier, as required by Iowa Code § 554.9611. Thus, regardless of whether GECC disposed of the copiers "in conformity with reasonable commercial practices," it remains undisputed that GECC failed to comply with Article 9's notice requirements in reselling the second copier.

GECC's failure to notify FPL about reselling the second copier triggers the rebuttable presumption rule. I must presume that GECC's deficiency damages are zero, unless GECC proves that, had it properly notified FPL, its resale proceeds would have been less than "the amount of the secured obligation, together with expenses and attorney's fees." Iowa Code § 554.9626, cmt. 3. Here, GECC has produced undisputed evidence rebutting the presumption that GECC's deficiency damages are zero. Specifically, GECC has produced undisputed evidence that it *did* notify FPL of its plans to resell the first copier (docket no. 9-3, at 10-11). Based on the analysis above, GECC resold the first copier in a commercially reasonable manner for $2,200. GECC resold the second copier in exactly the same manner, and for exactly the same price, as the first copier. The only difference between the sales was that GECC notified FPL of the first sale, but not the second. The fact that the second sale yielded the same result as the first is evidence that GECC would have received the same $2,200 had it notified FPL of the second sale. Again, FPL offers no evidence to the contrary.

7

Thus, I conclude that GECC would be in the same position it is in today had it complied with Article 9's notice requirement regarding the sale of the second copier.[1]

Because GECC has rebutted the presumption that it is entitled to zero damages, it is entitled to deficiency damages. Here, GECC's deficiency damages are the

> amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of:
>
> (1) the proceeds of the collection, enforcement, disposition, or acceptance; or
>
> (2) the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance.

Iowa Code § 554.9626(1)(c). Subparts (1) and (2) above are identical in this case because, as I noted earlier, the amount of proceeds GECC actually received is the same amount it would have received had it fully complied with Article 9's notice requirements. I will address the exact amount of damages that this formula yields below.

---

[1] FPL cites *C & J Leasing Corp. v. Beasley Investments, Inc.*, No. 08-0074, 2009 WL 777870 (Iowa Ct. App. Mar. 26, 2009), in support of its claim that this case should proceed to trial on damages. In *Beasley Investments*, a secured party stipulated that it failed to notify a debtor of its plans to dispose of collateral. *Id.* at *3. The Iowa Court of Appeals noted that "lack of notice itself suggests [a creditor] did not act in a commercially reasonable manner." *Id.* (quoting *Beneficial Fin. Co. v. Reed*, 212 N.W.2d 454, 458 (Iowa 1973)). But, in *Beasley Investments*, the secured party's failure to notify the debtor was not dispositive of whether the secured party was entitled to deficiency damages. Rather, the court in *Beasley Investments* applied the rebuttable presumption rule to analyze whether the secured party was entitled to deficiency damages. *Id.* at *5. That is the same methodology I apply here. Simply put, nothing in *Beasley Investments* suggests that GECC is not entitled to summary judgment.

### B. *Did GECC correctly calculate its deficiency damages?*

Given GECC is entitled to deficiency damages, one question remains: How much? Here, the parties' contract provides a formula for calculating damages. When a contract's terms are not ambiguous, I may decide questions of contact interpretation and construction as a matter of law, and I must enforce the contract's terms as written. *RPC Liquidation v. Iowa Dep't of Transp.*, 717 N.W.2d 317, 321 (Iowa 2006). Because the clauses governing damages in this case are not ambiguous, I will decide the amount of damages allowed under the parties' contract.

Under the parties' contract, if FPL defaults, "[GECC] may, in [its] sole discretion . . . require [FPL] to immediately pay [GECC] . . . a sum equal to the Net Book Value" (docket no. 9-3, at 7). The contract defines the "Net Book Value" as

> a sum equal to (1) all Rental Payments and other amounts then due and payable under the Lease, and (2) the present value of (i) all Rental Payments to become due during the remainder of the Lease term, and (ii) the Purchase Option amount set forth in this Lease, each discounted at (x) 6% per annum if this Lease provides for a Stated Purchase Option, (y) the lease charge rate (as determined pursuant to Section 16) if this Lease provides for a dollar Purchase Option, or (z) if such applicable rate is not permitted by law, then at the lowest rate permitted by law . . . .

(Docket no. 9-3, at 7). Finally, the contract provides that "[FPL] agree[s] to pay all of [GECC's] costs of enforcing [GECC's] rights against [FPL], including attorneys' fees" (docket no. 9-3, at 7). Based on these clauses, GECC claims that it is entitled to "$258,424.39, plus attorneys' fees and costs" (docket no. 14, at 5). GECC also submits a spreadsheet showing (what GECC claims are) FPL's outstanding payments (docket no. 14-2, at 15). The spreadsheet accounts for the net proceeds from reselling the copiers and reflects an outstanding balance of $258,424.39.

FPL argues that GECC's claimed damages are incorrect for two reasons. First, FPL argues that GECC overstates the number of rental payments "then due and payable" under the parties' contract, improperly inflating the number of non-discounted payments in the Net Book Value. Second, FPL argues that GECC applied the wrong interest rate in calculating the present value of future payments in the Net Book Value. Specifically, FPL claims that GECC applied a 6% interest rate in calculating FPL's balance due, when it should have applied the "lease charge rate" applicable to contracts with a dollar purchase option, like the parties' contract here. I will address FPL's second argument first.

While FPL is correct that GECC originally applied the wrong interest rate in calculating the Net Book Value, GECC has since fixed the error. Because the parties' contract contains a dollar purchase option (docket no. 9-3, at 5), future payments used in determining the Net Book Value must be "discounted at . . . the lease charge rate" (docket no. 9-3, at 7). Originally, GECC calculated FPL's outstanding balance using a 6% interest rate (docket no. 9-3, at 18), instead of the 8.2144% lease charge rate (docket no. 14-2, at 13). But, after FPL raised this issue in its response to GECC's motion for summary judgment, GECC recalculated FPL's balance using the 8.2144% lease charge rate (docket no. 14-2, at 15), and now claims damages based on its more recent calculation. Thus, GECC calculated the damages that it currently requests using the correct discount rate.

FPL's argument that GECC wrongly calculated the rental payments "then due and payable" in determining the Net Book Value is more complicated. GECC admits that the copiers were destroyed in late October of 2012 (docket no. 9-2, at ¶ 4). Thus, FPL claims that, at most, the only rental payment "then due and payable" when the

copiers were destroyed was its November 1, 2012, payment.[2] According to FPL, under the Net Book Value formula, the only non-discounted rental payment should be its November 1, 2012, payment, and all remaining rental payments should be discounted by the lease charge rate. By contrast, GECC calculates the Net Book Value using six non-discounted monthly rental payments—December 1, 2012, through May 1, 2013[3]—rather than one. Because GECC's calculation discounts fewer payments than FPL's, GECC's calculation yields a higher—in FPL's view, *inflated*—Net Book Value.

GECC's calculation is correct. FPL's argument incorrectly relies on language in paragraph 8 of the parties' contract, entitled "Loss or Damage" (docket no. 9-3, at 7). That paragraph provides:

> If any item of Equipment is lost, stolen or damaged, [FPL] will (and Rental Payments will continue to accrue without abatement until [FPL]), at [FPL's] option and cost, either (a) repair the item or replace the item with a comparable item reasonably acceptable to [GECC], or (b) pay [GECC] a sum equal to [the Net Book Value].

Because the copiers were damaged in the final days of October of 2012, FPL reasons that its November 1, 2012, rental payment was the only payment arguably "then due and payable" when the copiers were destroyed.

But, GECC does not rely on paragraph 8 in its claim for damages. While paragraph 8 defines the term "Net Book Value," GECC, in its reply brief, seeks

---

[2] Though not explicitly stated by either party, documents in the record show that FPL's rental payments were due on the first of each month (docket no. 14-2, at 12-13, 15).

[3] In its summary of FPL's outstanding balance, GECC does not claim that FPL's November 1, 2012, rental payment is outstanding (docket no. 14-2, at 15). Neither the documents in the record nor the parties' briefs explain why GECC does not claim that FPL owes a November 1, 2012, payment. Whatever the reason, GECC does not seek damages for the supposedly outstanding November 1, 2012, rental payment. This actually *benefits* FPL by lowering the number of rental payments used in calculating the Net Book Value.

damages under paragraph 11, entitled "Remedies" (docket no. 9-3, at 7). That paragraph provides, in part:

> If an Event of Default occurs, [GECC] may, in [its] sole discretion, do any or all of the following: . . . (b) require [FPL] to immediately pay [GECC] . . . a sum equal to the Net Book Value . . . (d) repossess the Equipment without court order . . . . [FPL] agree[s] to pay all of [GECC's] costs of enforcing [GECC's] rights against [FPL], including attorneys' fees.

An "Event of Default" occurs, among other ways, if "[GECC] do[es] not receive any Rental Payment or other payment within 10 days of its due date" (docket no. 9-3, at 7). Paragraph 11 also provides that, if GECC resells the repossessed copiers, "[FPL] will remain responsible for any balance which may remain after [GECC] appl[ies] [the] net proceeds" of the sale, and that "[GECC] will retain all rights and remedies even if [GECC] do[es] not chose to enforce them at the time of [FPL's] default" (docket no. 9-3, at 7).

Paragraph 11 allows GECC to demand that FPL pay GECC the Net Book Value simply because FPL defaulted on one, or more, rental payments, regardless of whether the copiers are damaged. Here, FPL has defaulted on every rental payment since at least December 1, 2012. In its contractually granted discretion, GECC waited until May 6, 2013, to demand that FPL pay the Net Book Value (docket no. 9-3, at 19-20). At that time, there were six rental payments "then due and payable."[4] Thus, GECC correctly calculated the number of non-discounted payments used in determining the Net Book Value under paragraph 11.

---

[4] On May 6, 2013, FPL's May 1, 2013, rental payment was technically not in default because it had not yet been due for more than ten days. It was, however, "due and payable," which is the term used to distinguish non-discounted and discounted rental payments in calculating the Net Book Value.

Moreover, even if GECC had relied on paragraph 8, FPL's argument would still fail. Paragraph 8 makes clear that, if the copiers were damaged, "Rental Payments [would] continue to accrue without abatement until [FPL]" paid the Net Book Value. Using FPL's logic, if the copiers were damaged, the only non-discounted rental payments in the Net Book Value would be those currently due at the moment the damage occurred. The rest would be discounted at the lease charge rate. In essence, the Net Book Value would be forever fixed at the moment the copiers were damaged. This interpretation would render ineffective the clause stating that "Rental Payments will continue to accrue" until FPL pays the Net Book Value. That clause plainly contemplates that FPL's rental payments will continue to accrue after, and independent of, the moment the copiers are damaged. I may not interpret the parties' contract in a way that gives no effect to one of its clauses. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991). Thus, I would have rejected FPL's argument even if GECC had relied on paragraph 8 in calculating its damages.

Because GECC calculated the Net Book Value using the correct number of non-discounted payments and the correct discount rate, I find that GECC is entitled to damages in the amount it requested.

### III. CONCLUSION

For the reasons discussed above, GECC's motion for summary judgment is granted in full. The Clerk shall enter judgment in favor of GECC, and against FPL, for $258,424.39, plus attorneys' fees and costs. If GECC plans to seek attorneys' fees and costs not already accounted for, it should proceed according to Federal Rule of Civil Procedure 54(d) and Local Rule 54.1.

**IT IS SO ORDERED**.

**DATED** this 3rd day of February, 2014.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA